Filed 2/17/26  D.B. v. Superior Court CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| D.B.,<br><br>   Petitioner,<br><br>  v.<br><br>THE SUPERIOR COURT OF SANTA CLARA COUNTY,<br><br>   Respondent;<br><br>SANTA CLARA COUNTY DEPARTMENT OF FAMILY AND CHILDREN'S SERVICES,<br><br>   Real Party in Interest. | H053827<br>(Santa Clara County<br> Super. Ct. No. 19JD025777) |

D.B. (Mother), mother of the child at issue here, has filed a petition for extraordinary writ challenging the juvenile court's order setting the matter for a Welfare and Institutions Code section 366.26[1] permanency planning hearing.  Mother contends that she did not receive reasonable reunification services and therefore the court erred in terminating her services at the 18-month review hearing.  She also requests a stay of the section 366.26 hearing.

---

[1] Unspecified statutory references are to the Welfare and Institutions Code unless otherwise indicated.

For the reasons set forth below, we determine that substantial evidence supports the juvenile court's finding that Mother received reasonable reunification services. We will therefore deny the petition and the request for a stay.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. *Section 300 Petition (March 2024)*

The Department of Family and Children's Services (Department) filed a petition under section 300, subdivisions (b)(1) [failure to protect] and (c) [serious emotional damage] alleging that the child, then seven years old, came within the jurisdiction of the juvenile court.[2] The petition alleged that the child was at substantial risk based on the parents' verbal and physical altercations and alcohol abuse. The child was the subject of a prior dependency proceeding between 2019 and 2022, due to the parents' domestic violence and substance abuse.

According to the most recent petition, the parents engaged in an altercation while the child was present. Father was arrested for violating a peaceful contact order. Mother violated a custody order by allowing Father to have contact with the child without supervision by the paternal grandmother. The child reported that she did not feel safe when the parents fought.

The petition alleged that on another occasion, law enforcement found Mother in a vehicle with the child crying in the backseat. Mother's speech was slurred, she smelled of alcohol, and there were open bottles of alcohol in the vehicle. The child told law enforcement that she did not believe Mother was able to care for her at that time. Mother allegedly abused alcohol daily.

The child was placed in protective custody. Following a detention hearing, the juvenile court ordered supervised visitation for Mother and Father.

---

[2] The petition was later amended to delete factual allegations not relevant here.

**B. *Jurisdiction/Disposition (April 2024)***

In a report for the combined jurisdictional and dispositional hearing, the Department recommended that the section 300 petition be sustained, that the child be adjudicated a dependent of the court, and that both parents receive family reunification services. According to the report, Mother and Father had been married since 2015. The child witnessed verbal and physical altercations between the parents, with each parent a perpetrator at different times. Mother and Father also had a long history of struggling with alcohol abuse. They had completed inpatient substance abuse programs but were unable to maintain their sobriety.

The Department received numerous referrals alleging general neglect and emotional abuse of the child. Some of the referrals resulted in the following:

In 2017, when the child was about six months old, the Department provided informal supervision services for several months. The services were based on a referral raising concerns that the child had been exposed to domestic violence between the parents and that Mother was often intoxicated in front of the child.

Less than two years later, in 2019, the juvenile court sustained a dependency petition based on domestic violence and alcohol abuse by the parents, which placed the child at risk of emotional and physical harm. The family received reunification services, and Mother was eventually given family maintenance services. Mother participated in, among other services, a parenting class, counseling, random drug testing, and a 12-step program. Father's reunification services were terminated due to lack of participation. The case was dismissed in 2022, with an order giving Mother sole legal and physical custody of the child.

Later that same year, and continuing into 2023, when the child was about six years old, Mother agreed to voluntary family maintenance services, which included drug testing and treatment, parenting classes, and domestic violence support. However, Mother did not engage in the services.

During the instant dependency proceeding, maternal and paternal relatives reported that Mother drank around the child.  A relative also reported that the child was not eating while in the care of Mother and was not attending school consistently.

The child reported that her parents fought a lot because of alcohol, and that she felt sad and scared when it occurred.  The child remained at a resource family home.  Mother had supervised phone calls and visits with the child.  The child had "struggled with hyperactivity, emotional dysregulation, and physical aggression in the past" but had "stabilized" since engaging in therapeutic services, which included services from a "Pacific Clinic Katie A. treatment team" (Katie A. team).[3]

Mother was currently participating in an inpatient residential treatment program. Father was in jail but expressed a desire to reunify with the child.  Both parents loved the child, acknowledged their substance abuse, and were aware of the need to make a change to keep the child safe.

By the time of the April 2024 combined jurisdictional and dispositional hearing, Father was no longer in jail.  The parents submitted the petition based on the Department's report and other documents.  The juvenile court found the allegations of the petition as amended true and adjudged the child a dependent of the court.  The court ordered family reunification services, which included the following for Mother: parenting classes, counseling addressing domestic violence and the impact on a child, random alcohol testing twice a week, a drug treatment program as recommended in a substance abuse assessment, an aftercare drug treatment program, development of an aftercare relapse prevention plan, a 12-step or other substance abuse self-help program,

_____

[3] According to testimony provided at the contested 18-month review hearing, the Katie A. team included a facilitator and a family specialist.  The facilitator led child and family team meetings with the child, the parents, and the treatment team.  The family specialist "focuse[d] on [the child's] treatment goals," which included behavioral goals such as coping skills and communication skills.  The child also participated in individual therapy for a period of time.

and a domestic violence victims' support group.  The court ordered supervised visitation for a minimum of two hours, twice per week.

### C. *Six-Month Review (October 2024)*

The Department's report and addendum for the six-month review hearing recommended that reunification services be continued for the parents.  The Department explained that Mother needed to continue working on maintaining her sobriety.  The Department was also concerned about Mother's ambivalence toward continuing her relationship with Father despite the lengthy history of domestic violence between them.  Father had minimally engaged in his case plan before being taken into custody again.

Mother expressed interest in remaining engaged in her recovery, showed concern for the child's well-being, and communicated regularly with the social worker.  She was enrolled in a parenting class and attending domestic violence support groups.  Mother was in residential treatment from March to August 2024.  Thereafter, she had two relapses about a week later and a month later.  She also had an "abnormal dilute test."  Mother was currently residing in a transitional housing unit.  She was attending Alcoholics Anonymous (AA) meetings and also participating in an outpatient program.  In addition, Mother was seeing a therapist.  Mother was actively engaged during visitation with the child, and the Department anticipated unsupervised visits in the future.

The child remained in a resource family home.  Her school attendance improved from 70 percent to 100 percent, but she was performing below grade level.  She participated in therapy weekly.

At the six-month review hearing, the juvenile court continued reunification services and ordered supervised visitation for each parent.

### D. *Twelve-Month Review (April 2025)*

The Department's report for the 12-month review hearing recommended that reunification services be continued for both parents.  The Department explained that although Mother was engaged in all case plan services, she had several relapses and

"dilute tests" since completing her inpatient program. The Department believed that it was "imperative" for Mother to show "changed behavior and mindset, not just a completion of service components." This would include "proactively maintaining her sobriety" and "implementing learned parenting skills during unsupervised visits." Father had been released from custody and had only recently started engaging in his case plan.

Mother resided in a transitional housing unit but was looking for a suitable apartment for the child and herself. In the meantime, she had unsupervised overnight visits with the child on two occasions in January and mid-February 2025.

Mother subsequently relapsed in late February 2025. Prior to the relapse, the Department intended to recommend at the 12-month review hearing that the child return to Mother. The day before an extended weekend visit between Mother and the child, Katie A. team members accompanied the child to help her move into Mother's transitional housing unit. Mother had slurred speech, could not walk straight, and smelled of alcohol. Although she initially denied relapsing, Mother later reported having one beer at a restaurant with friends to celebrate the child moving into the transitional housing unit. The weekend visit was canceled.

The child initially appeared to "mirror" the Mother who was angry that the social worker was called. Upon the child's return to her caregiver, she appeared " 'relieved' that she had somewhere safe to return . . . and was able to say goodbye to [Mother] prior to departure." The child later reported that Mother had told her that she drank vodka and " 'two shots,' " that friends forced her to drink, and that the child should not tell anyone. The child disclosed that she was scared Mother would drink again and that she (the child) would be removed again. The child asked the social worker who the child should contact if she was returned to Mother and Mother started drinking again after the case was closed. The Katie A. facilitator reported that the child expressed similar mixed feelings and fears about spending more unsupervised time with Mother. The Katie A. team

intended to submit a referral for family therapy for Mother and the child to work on rebuilding trust once family therapy was deemed appropriate by the therapists.

The social worker discussed with Mother the change in recommendation that reunification services for "another six months was most appropriate." The social worker also discussed the need for Mother to focus on sobriety, be honest, take accountability, and the importance of not telling the child to keep secrets.

Mother completed a parenting without violence class and a 14-week domestic violence support group (although she continued to attend weekly sessions). Regarding twice-a-week drug testing, there were four missed tests and one positive test for alcohol prior to early November 2024. Thereafter, she had "four dilutes." It was repeatedly discussed with Mother the importance of drinking liquids after, not before, testing, and "what dilute tests convey." Mother continued to attend AA meetings, had started over on step one, and planned to contact her sponsor daily. She also developed a written relapse prevention plan which was to be updated with her outpatient counselor. Mother's therapist reported that Mother was consistently engaged and working towards addressing the issues that brought her family to the attention of the Department.

Regarding Mother's perception of her needs, Mother reported that she was " 'getting' " what she " 'need[ed] right now.' " She indicated that she had support from people in her " 'circle,' " and that she was focusing on " 'staying sober' " and doing " 'mental self-care.' "

At the 12-month review hearing, the juvenile court continued reunification services for both parents, ordered supervised visitation for Father, and ordered unsupervised weekend overnight visits for Mother.

**E.  *Section 388 Petition (May 2025)***

About two months after the 12-month review hearing, the Department filed a section 388 petition requesting that Mother's visitation be changed from unsupervised to supervised for two hours, twice a week. The Department had received a report that

Mother was intoxicated when the child was in her care at the transitional housing unit in mid-May 2025. Mother denied that she had been intoxicated. The child stated that Mother had slurred speech and was intoxicated. The child also stated that Mother admitted to drinking on two other occasions, one week prior and two weeks prior. The child further reported that Mother told her that if she said anything to the social worker or anyone else, she would be taken away forever. The juvenile court granted supervised visitation pending a hearing on the Department's petition.

According to the Department's addendum report, a few days after the reported May 2025 relapse, the social worker met with Mother to discuss the incident. Mother continued to deny that she was intoxicated. The social worker "reminded" Mother about their meeting after the last relapse incident in February 2025. The social worker indicated that they " 'need[ed] to move forward with looking at permanency options' " for the child, and that legal guardianship was "the best permanency recommendation from the Department." The social worker also indicated that future visitation would need to be supervised. About a month later, when the social worker again discussed the relapse incident with Mother, Mother indicated that she was proud of the child for speaking up but that the child was lying about the incident.

The child reported that she wanted to visit Mother but live with someone else. On another occasion, the child stated that she only wanted to live with Mother if Mother was " 'doing good.' " The child at some point expressed that she was scared Mother was going to choose alcohol, that " ' "alcohol is mommy's best friend," ' " and that she " ' "was trying to be a good kid so that mommy doesn't choose alcohol." ' " (Italics omitted.) Mother and the child resumed supervised visits in late May 2025.

The Department believed that Mother's repeated substance use and request for the child to lie "diminishe[d] the protective role" and was "emotionally manipulative." The Department also believed that Mother was "minimizing" and did not understand "the consequences of her behavior and the negative impact" on the child.

8

At the hearing on the section 388 petition in late July 2025, Mother informed the juvenile court that she agreed to supervised visitation upon learning that the child did not feel comfortable with or ready for unsupervised visits. The Department stated that it was withdrawing the petition based on an agreement by the parties that Mother's visitation would be supervised a minimum of two times per week, two hours each visit. The court ultimately changed Mother's visitation to supervised, with discretion to the social worker to move to unsupervised and overnight visits.

At the hearing, Mother also requested that the case plan be amended to include family therapy as deemed appropriate by the child's therapist. Mother stated that the child was not currently comfortable with or willing to attend unsupervised visits with her. Mother wanted the case plan to "address this need, if it is an appropriate tool to address this need, and to hold the Department to explaining why or why not family therapy is appropriate or not." Mother believed "that if reunification should at all be possible that we really need to have some answers as to whether family therapy could work and, if so, if that can be arranged as soon as possible."

The Department responded that the Katie A. facilitator, who had been involved with the family for the last two years, held two family sessions in May and June 2025. No further sessions occurred because (1) the child indicated that she did not want any contact with Mother outside of supervised visits, and (2) the child appeared "dysregulated" and the facilitator determined that the sessions were emotionally harmful to the child. The Department had scheduled a child and family team (CFT) meeting with the parents and the Katie A. team to discuss whether family therapy was appropriate at this time.

The juvenile court ordered the Department to convene the CFT to discuss the issue of whether Mother and child were ready to engage in family therapy, and if they were ready, then for the Department to use all efforts to expeditiously begin family therapy. The court noted that the scheduled 18-month review was six weeks away.

9

### F.  *Eighteen-Month Review*

#### 1.  CASA report (August 2025)

The child's court appointed special advocate (CASA) reported that the child was "very happy" at a new placement.  However, the child appeared to be "losing faith in her parents."  The CASA observed that "[a]fter each relapse and backslide by mom, [the child] talked about her less and less."

#### 2.  Eighteen-month review report (August 2025)

In the report for the 18-month review hearing, the Department recommended that reunification services be terminated and that a section 366.26 hearing be set to establish legal guardianship for the child.

After the reported relapse by Mother in May 2025, the child consistently expressed that she did not want to reside with Mother unless Mother was " 'doing good.' "  On August 1, 2025, the child transitioned to and was doing well in a new placement, which was a concurrent home.  About a week later, the child told the social worker that she wanted to remain living with her current caregiver and continue having supervised visits with her parents.

Although the child had participated in therapy over the past year, the therapy and family sessions stopped in June 2025, at the child's request.  The child expressed that she did not want to engage in individual therapy " 'ever again' " and that she did not want to engage in family therapy.  The social worker stated that "[w]ith the emotional impact of the most recent incident," the Katie A. team would "continue to assess whether family therapy is appropriate so that [the child] and [Mother] can work on re-building trust between them."

Mother had to leave her transitional housing unit after using all approved extensions.  She lived temporarily in a motel before moving into a substance-use residential facility.

After the reported May 2025 relapse, the social worker convened a CFT meeting to discuss the concerns regarding the relapse and to create a plan to support the family. The social worker also informed Mother that they needed to " 'move forward with looking at permanency options' " for the child. The social worker indicated that legal guardianship would be recommended by the Department.

Since the May 2025 relapse, Mother had remained engaged in her services, including attending 12-step meetings, participating in drug testing, engaging in outpatient and therapeutic treatment, and attending domestic violence support groups. She also continued to remain in contact with the social worker. Further, Mother had obtained part-time employment.

Mother attended supervised visits with the child. The social worker reported that the pair had "a strong bond." Although the child currently did not want to transition to unsupervised visits, she indicated to the social worker that she wanted supervised visits from 7:00 a.m. to 7:00 p.m. with Mother. The social worker responded that visits would be transitioned to unsupervised when the child was ready.

Regarding drug testing during the most recent reporting period, Mother missed one phone call, had four "unforgiven missed tests" out of a total of 41 tests, and had one "abnormal test that was dilute." Regarding the 12-step program, Mother had "started over on step one" and was not currently connected with a sponsor. She completed an updated relapse prevention plan with her outpatient counselor. Mother continued meeting with her therapist.

The most recent services and/or referrals provided by the Department for Mother and the child included: monthly and as needed in-person contact with the child and with Mother; ongoing contact with Mother by phone calls, text, and/or e-mail; arranging supervised visits for the child and parents; transportation for visits; attending CFT meetings for the family by Katie A. and by the Department; providing bus passes to Mother; assessing the current caregiver for a concurrent home; and contact with

caregivers, the transitional housing unit director for Mother, the residential facility staff for Mother, the child's elementary school, the Katie A. team, Mother's mentor parent, the permanency coordinator, and the individual therapist and the outpatient counselor for Mother.

Regarding the Mother's perceptions of her needs, she stated, " 'I just need more time now that I am back into a program. I need more testing so we know that I'm consistent. More meetings and to find a sponsor because I haven't had a sponsor in a few months. As well as those visits with baby girl. I'm still doing DV once in a while."

The Department believed that there was still a risk if the child was returned to her parents at this time, and that a return to either parent would be detrimental. Mother was currently engaged in all case plan services except for having a sponsor. However, "[d]espite engaging in services consistently to address her mental health issues, [domestic violence], and alcohol abuse disorder, the relapse incident from [May 2025] and the events afterward are of concern currently. [Mother] has not shown changed behavior or insight into how the relapse incident and coaching [the child] to lie, then calling her daughter a liar has impacted their relationship. Because of this, [the child] does not trust that [Mother] is ready for her to be returned and does not desire to return home to her Mother at this time." In addition, the social worker was "concerned about the lack of accountability from [Mother] when confronted about the incident. There [was a] high risk of [Mother] relapsing again as she has done many times over the last several years, which places [the child] at risk if returned to her care."

The Department believed that although the child loved her parents and had a close bond with them, the child "desire[d] and deserve[d] a consistently safe and stable environment." The most recent relapse had "broken the trust that [the child] has with [Mother], and this needs time to be repaired through family therapy in the future. This is the second Court dependency case and the family received [voluntary family maintenance] services previously; yet despite [Mother] completing services before and

12

currently to address the concerns, this case is still high-risk to return to the attention of the Court if [the child] were to be returned to her mother's care."

The Department explained that although Father loved his daughter and shared a close bond with her, he had not been consistent with his case plan components and was not testing to demonstrate he was clean and sober.

The Department determined that the most appropriate permanent plan was legal guardianship because the child would "benefit from permanency with a family who will support her continued connection to her biological family." The current caregivers were willing to become the child's legal guardians.

### 3. Initial 18-month review hearing (September 2025)

At the scheduled 18-month review hearing, Mother requested a contested hearing. Mother disagreed with the Department's recommendation to terminate services and instead wanted services until the 24-month review. Father joined the request for a contested hearing, because he believed it was in the child's best interest to reunify with Mother. Counsel for the child submitted on the Department's recommendation, based on the "best interest" of the child. Counsel indicated that the child's "[s]tated interest" was that she did not want to return now, but that she did want to return in the future. Counsel explained that the child "was thinking a year from now. She just wants to make sure the house is safe."

### 4. Addendum report (September 2025)

According to an addendum report, the social worker met with the child in mid-September 2025. The child indicated that she wanted to live with her parents with " 'no alcohol anywhere,' " and that she was worried about her parents drinking and fighting. If her parents were not able to refrain from drinking and fighting, the child wanted to continue living with her current caregivers.

Mother reported that she was on step four of the 12-step program, which she was working on in the residential program that she had entered in late July 2025. She had

13

been without a sponsor since mid-May but reported that she was trying to find another sponsor. Mother continued to "test clean." Although she acknowledged the February 2025 relapse incident, she still denied the May 2025 incident and accused the child of lying about it happening.

Mother's residential program included education, case management, parenting classes, 12-step meetings, life skills training, overcoming obstacles, spiritual guidance, and random drug testing twice a week. The residential program reported that Mother was consistently participating in all classes, meetings, and events. The program was six to 10 months in duration and could extend beyond a year.

The Department believed that although "service compliance is a positive indicator, it is not sufficient to determine safety or parental capacity." The Department was concerned regarding Mother's "lack of accountability and denial" regarding the May 2025 relapse incident. Mother had told the child to withhold information from the Department and that disclosure could result in her being permanently removed from Mother. Mother also indicated that the child was dishonest when the child reported the incident to her behavioral health team and the Department. The Department determined that Mother's behavior showed "an absence of insight into the impact of her substance use on [the child]" and "a concerning pattern of emotional manipulation." The Department believed that this placed the child "at risk of psychological harm, undermine[d] her sense of safety and trust, and compromise[d] the integrity of the parent-child relationship." The Department further stated that, "despite consistent engagement in services, the last two relapse incidents were at critical moments of the case and took place while [the child] was in [Mother's] care. Furthermore, while it is admirable that [Mother] has sustained living in structured environments to facilitate further support of her sobriety, [she] has not yet been assessed outside of a structured environment to determine her capacity to fully meet [the child's] needs in addition to demonstrating she can manage life stressors independent of a residential program. This raises concern that

14

under future stressors, [Mother] may revert to maladaptive coping mechanisms, including alcohol use, in the presence of [the child], which is consistent with [Mother's] pattern of behavior. The absence of sustained behavioral change and insight increases the likelihood of relapse in the future and continued risk to [the child]."

Regarding visitation, the child indicated to the social worker in mid-September 2025 that she wanted unsupervised visits to begin in " 'two months.' " However, due to the child "witnessing the last relapse incident, the emotional impact, and the ruptured trust between [the child] and her mother," the Department recommended that the pair "participate in family therapy prior to unsupervised visits to begin to repair the trust between [them]." The Department believed that "initiation of family therapy should not occur until there [was] a formal clinical recommendation from [the child's] behavioral health team once [the child] is ready."

Attached to the addendum report were notes from Bridging Families (formerly Katie A.) regarding a CFT meeting on July 31, 2025. Those present at the meeting included Mother and the social worker. Issues addressed at the meeting included why the child's therapy was stopped and when it would resume. The meeting notes reflect that the child had repeatedly indicated to various individuals in June and July 2025 that she no longer wanted to participate in any therapy, including family therapy. The team concluded that it would "continue to assess the appropriateness and readiness for therapy."

### 5. Contested 18-month review hearing (October 2025)

At the contested 18-month review hearing, the Department recommended that family reunification services be terminated for both parents and that a section 266.26 hearing be set to establish legal guardianship for the child. Father submitted on the Department's recommendation that his reunification services be terminated. Counsel for the child submitted on the Department's recommendations and indicated that the child wanted legal guardianship with her current caregiver.

15

Mother requested that services be extended to the 24-month review. She argued that there were "no reasonable services" during "these last six months." Relevant to Mother's instant petition, the evidence presented at the contested hearing was as follows:

The child's social worker testified as an expert in risk assessment, provision of services, and permanency planning in juvenile dependency cases. The social worker explained that "from the beginning" of a case, parents are "apprised of the potential outcomes including reunification, adoption, legal guardianship, or other permanency options." It was "important" for the Department "to be transparent . . . with parents . . . regarding the potential outcome of their case, if they either do or do not follow the case plan and show changed behavior." During the most recent reporting period from April 2025 to present, the social worker had discussions with both parents about adoption.

The social worker also "continue[d] to assess the family during the entire reporting period." This included consulting with other behavioral health professionals, including Mother's therapist and the child's Katie A. team facilitator. The social worker explained that "[w]hen assessing the parents' progress with their case plan services and also the behavioral and emotional treatment team that [the child] is a part of with [Katie A.], it is important to obtain information on the progress of how [the child] is doing and also the progress of how [Mother] is doing, and what their thoughts are, separately, on reunification, and how the relationship is between the parent and the child." The social worker testified that she collaborated as a team with the behavioral health professionals, and that they also had CFT meetings "to discuss concerns about the case as well." Further, the social worker communicated with the child's caregivers regarding how the child's parents were "doing with their case plan components," "the likelihood . . . of reunification or not," permanency plans, and whether the caregivers were willing to be a concurrent home and sign an agreement to that end.

16

The social worker testified that this was the family's second dependency case, and that the family also had voluntary family maintenance services on two separate occasions. This affected the social worker's assessment of the case. The social worker explained, "It is concerning that this is the fourth time that the family has received services for the same issues of alcohol use, emotional abuse, and domestic violence. And with receiving these services there's been case plan compliance, but not a change in behavior, which is what [t]he Department also assesses for. We do not just assess for case plan compliance. There needs to be changed behavior and accountability that decreases risk to the child."

Mother's last reported relapse "impacted" the social worker's assessment of the case. The social worker was also concerned about the circumstances of the relapse incident, including the child's statements about the incident. The social worker testified that "despite the engagement in services four times over, it does not show changed behavior or changed insight or accountability into how [Mother's] behavior affected [the child] with witnessing and being a part of that conversation that she reported."

The social worker explained that the child had "been communicating this entire time" that she was scared to return home to Mother because she believed Mother would drink again. By the child "witnessing these last two recent relapses this year, that pretty much confirmed her fear and that is why it's so impactful to her."

The social worker acknowledged that after mid-September 2025, the Department made a recommendation for family therapy before unsupervised visits by Mother, that family therapy would not occur until there was a formal clinical recommendation from the child's behavioral team that the child was ready, and that this was "essentially, an additional service for this family when appropriate." However, previously, in mid-May 2025, the social worker told the Mother that " '[w]e need to move forward with looking at permanency options' " for the child. The social testified that although she talked to Mother about permanency options, the social worker's "assessment [was] still ongoing"

17

at that point. The social worker believed that "parents with substance abuse issues can reunify with their children." However, the social worker was concerned about the "pattern" demonstrated by Mother and whether she would be able to maintain sobriety.

In May 2025, after the reported relapse, the social worker communicated to the Katie A. facilitator that the child would "most likely need adoption" and that the parents would have to be "convince[d] . . . to let her be adopted.' " The social worker testified that "the purpose of this conversation was just to talk to [the Katie A. facilitator] about what [t]he Department was thinking about at the time," and that there was "still . . . an ongoing assessment with the parents."

The social worker also communicated to the Katie A. facilitator that if a legal guardianship was implemented, the social worker knew that " 'the parents won't get her back. They're going to fall back into their addiction.' " The social worker testified that she did not know one "hundred percent" whether Mother would find lifelong sobriety, but "based on the pattern it is a concern."

The social worker communicated to the child's current caregiver that the parents had " 'this disease . . . since preteen years,' " and the social worker "d[id]n't think that they [could] show up fully to parent their child no matter how much they love her.' " However, the social worker also testified that she believed that parents who have been drinking their whole lives can find lifelong sobriety.

The social worker testified that the visitation plan had not been adjusted because of any action by the child, and that it was not up to the child to determine how visitation was going to go. It was also not up to the child or the Department to decide when the parties could move to family therapy. Instead, the decision for family therapy would be based on the service provider's assessments. Currently, "they have not stated that the parties are ready for family therapy." The social worker testified that "when you make any sort of an assessment, they continuously change," meaning "as assessment you made four months ago may not be the same that you hold today."

18

Mother testified that she was not asking for the child to be returned home immediately. Rather, she wanted "a little bit more time to continue services" because there was "some work to be done." She also "respect[ed]" her daughter, "need[ed] her to heal and get some more time," and "need[ed] us to heal as well." Mother testified that she was "back into inpatient only because of homelessness." She testified that her longest period of sobriety was from 2014 to 2017.

The Pacific Clinics Katie A. facilitator, who led the CFT meetings, testified that services were currently being provided to the child twice a week. The services included behavioral support, which encompassed working on coping skills and communication skills. In June 2025, which was after Mother's May relapse, the child asked to stop individual therapy because she did not want to talk about Mother and instead wanted to focus on being happy with the caregiver. The child also indicated that she wanted to focus on her treatment goals, which were to improve communication and coping skills. The Katie A. team decided to pause individual therapy, monitor the child, and then refer her to therapy when she was "safe and stable." The Katie A. facilitator was assessing the child every week regarding whether starting individual therapy was appropriate. The Katie A. facilitator did not believe the child was currently ready for individual therapy again.

The Katie A. team previously had at least two family sessions with the child and Mother. In family sessions, the Katie A. team "model[s] positive and healthy play" through, for example, doing art or having sessions at the park. At one session, the child "presented as avoidant," and at another session she "presented as nervous and dysregulated." The Katie A. team, including the child's therapist, determined that "it was best to pause the family sessions."

The Katie A. team was also assessing for family therapy, which the Katie A. facilitator believed would be appropriate once the child stabilized. A referral had not yet been submitted for family therapy. The team was focusing on the child's transition to a

19

new foster home, and an assessment had indicated that family therapy would not be appropriate at that time.

Mother's therapist testified that Mother's primary treatment goal was "abstinence, sobriety." They were "work[ing] mostly on how her triggers affect her mental health to assist her in getting the coping skills necessary so that she doesn't feel the need . . . to self-medicate with substances." The therapist testified, "We still have a lot more work to do." The therapist stated that since the May incident, Mother had "upped her game. She's upped her recovery."

In a written brief after the conclusion of testimony, Mother contended that she was denied reasonable services after May 2025, when the social worker believed Mother had a relapse. Although there were four months remaining for reunification services, the social worker "undermined reunification and influenced service providers and the caregiver to view the mother negatively, which is inherently unreasonable." Mother argued that although the social worker "must make concurrent plans" and had a "responsibility to advise . . . mother of possible permanency outcomes aside from reunification," this did "not mean [the social worker was] supposed to actively stop reunifying." Mother contended that the child "began to refuse individual therapy after learning she would no longer be reunifying with her mother. It is unclear if more could have been done to encourage therapy, and thus for family therapy to have begun for [the child] and [Mother] to finally process the events of May." According to Mother, the social worker "cannot genuinely provide reasonable services when she is not working towards reunification."

In a written brief, the Department contended that although Mother "undeniably loves her daughter," Mother had "been unable to maintain her sobriety and ha[d] failed to demonstrate changed behavior and insight into how her continued alcohol abuse impacts [the child] and places her at substantial risk of harm in her care." The Department argued that although "both parents have had several opportunities to engage in services to

20

address [substance abuse], neither parent has demonstrated lasting behavioral changes." The Department also contended that it had provided reasonable services. Regarding family therapeutic sessions, such services were determined not yet appropriate by the mental health providers. Family sessions were stopped because the child became " 'dysregulated.' " The Katie A. team regularly assessed whether reengagement in family therapeutic sessions was appropriate. In the meantime, the team had "focused on supporting [the child] address her behavioral health needs and to meet her treatment goals." The Department also argued that the social worker did not exhibit bias against Mother. The social worker continued to assess the family during the entire reporting period, including assessing concurrent planning. Further, informing the Katie A. team about a parent's progress in the case plan assisted the team in providing support and services to the child.

The juvenile court announced its decision in October 2025. The court terminated reunification services for the parents and set a section 366.26 hearing. The court expressed concern regarding Mother's "inability to maintain as clean and sober for a length of time." The court made several findings, including that returning the child to her parents would create a substantial risk of detriment to the child, and that by clear and convincing evidence reasonable services were provided. The court observed that Mother contended that reasonable services were not provided because no family therapy services were provided. The court explained, however, that the Katie A. team determined that family sessions were not appropriate due to the child's responses and dysregulating behavior during the sessions. The court further found that "the Department did provide plenty of services to the family. The evidence shows that [the social worker] worked tirelessly with the parents, and in particular with the mother, to ensure that she had the services that she needed. In addition, [the child] was provided with appropriate WRAP services."

## II.   DISCUSSION

Mother contends that there is no substantial evidence upon which the juvenile court could have found by clear and convincing evidence that the Department provided reasonable services.[4]

### A. *Reunification Services and Standard of Review*

"When a child has been removed from a parent's custody, the court ordinarily must order child welfare services designed to facilitate the reunification of the family. [Citations.]" (*Michael G. v. Superior Court* (2023) 14 Cal.5th 609, 624, fn. omitted.) The reunification services "must be 'designed to eliminate those conditions that led to the court's finding that the child is a person described by Section 300.' [Citation.]" *In re T.G.* (2010) 188 Cal.App.4th 687, 696 (*T.G.*).)

The supervising agency " 'must make a good faith effort to develop and implement a family reunification plan. [Citation.]' " (*T.G.*, *supra*, 188 Cal.App.4th at p. 697.) "The standard is not whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances." (*In re Misako R.* (1991) 2 Cal.App.4th 538, 547.) " ' "[T]he record should show that the supervising agency identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained reasonable contact with the parents during the course of the service plan, and made reasonable

---

[4] In the introductory section of her petition, mother also requests that this court vacate the juvenile court's finding that if "the children" are returned to her care, there is a substantial risk of detriment. In the concluding section of her petition, mother requests that this court find that "these children" can safely return to her care.

Mother does not provide any argument demonstrating that the juvenile court's finding of detriment was erroneous. We therefore consider the contention abandoned by mother. (See *In re Phoenix H.* (2009) 47 Cal.4th 835, 845 [explaining that " '[c]ontentions supported neither by argument nor by citation of authority are deemed to be without foundation and to have been abandoned' "].)

efforts to assist the parents in areas where compliance proved difficult . . . ." [Citation.]' [Citation.]" (*T.G.*, *supra*, at p. 697.)

A "reunification plan must include visitation. [Citation.]" (*In re Luke L.* (1996) 44 Cal.App.4th 670, 679.) "Visitation shall be as frequent as possible, consistent with the well-being of the child." (§ 362.1, subd. (a)(1)(A).)

At the 18-month review hearing, the juvenile court "shall determine by clear and convincing evidence whether reasonable services have been offered or provided to the parent . . . ." (§ 366.22, subd. (a)(3).) If "reasonable services have not been provided, . . . "the court shall extend reunification services for an additional six months." (*Id.*, subd. (b)(2)(A); see *id.*, subd. (b)(3).) However, "if the court finds by clear and convincing evidence based on competent evidence from a mental health professional that extending the time period for reunification services would be detrimental to the child, the court is not required to extend reunification services for an additional six months." (*Id.*, subd. (b)(2)(B); see *Dora V. v. Superior Court* (2024) 104 Cal.App.5th 987, 1003.)

" 'A finding that reasonable reunification services have been provided must be made upon clear and convincing evidence. [Citation.]' " (*Serena M. v. Superior Court* (2020) 52 Cal.App.5th 659, 674.) "[W]hen reviewing a finding that a fact has been proved by clear and convincing evidence, the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 995-996; see *In re V.L.* (2020) 54 Cal.App.5th 147, 155.) In making this determination, the appellate court "must view the record in the light most favorable to the prevailing party below and give due deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence." (*Conservatorship of O.B.*, *supra*, at p. 996.)

**B.** *Analysis*

Mother contends that she was not provided reasonable reunification services. We determine that there is substantial evidence from which the juvenile court could have found it highly probable that the Department provided reasonable services to Mother. (See *Conservatorship of O.B.*, *supra*, 9 Cal.5th at pp. 995-996.)

The record reflects that the ordered reunification services for Mother included parenting classes, counseling, random alcohol testing twice a week, a drug treatment program as recommended in a substance abuse assessment, an aftercare drug treatment program, development of an aftercare relapse prevention plan, a 12-step or other substance abuse self-help program, and a domestic violence victims' support group. The court also ordered supervised visitation for a minimum of two hours, twice per week. By the time of the 18-month review hearing, Mother had either completed the components of the case plan, or was engaging in the component on an ongoing basis, such as random testing, AA meetings, counseling, and visitation. Mother and the social worker also communicated regularly. As the juvenile court aptly observed, "[t]he evidence shows that [the social worker] worked tirelessly with the parents, and in particular with the mother, to ensure that she had the services that she needed."

Mother contends that the Department "stopped trying to reunify" after her May 2025 relapse and instead "actively thwarted and worked against reunification." In support of this argument, Mother relies on the fact that visitation was changed back to, and remained, supervised after her May relapse. She contends that the child "requested to progress to unsupervised visits during the reunification period." Mother also argues that "introducing" family counseling as "an additional service was nothing more than an arbitrary attempt to justify the Department's decision to effectively thwart reunification."

We are not persuaded by Mother's arguments.

First, regarding visitation, at the combined jurisdiction/disposition hearing, the juvenile court ordered supervised visitation for a minimum of two hours per visit, twice

24

per week. At the 12-month review hearing, the court ordered unsupervised weekend overnight visits. Less than two months later in May 2025, however, Mother suffered a relapse at her transitional housing unit while the child was in her care. This was the second relapse in the child's presence in less than three months. After the latter relapse, the Department filed a petition requesting that Mother's visitation be returned to supervised. Mother ultimately *stipulated* to the Department's request for visitation to be supervised, after acknowledging that the child was uncomfortable or not ready for unsupervised visits. The Department consequently withdrew its petition, and the court ordered supervised visitation for a minimum of two hours per visit, twice a week.

Although Mother contends that the child later requested unsupervised visits, the record reflects that the child made this request in mid-September 2025, to begin unsupervised visits in " 'two months,' " that is, November 2025. However, commencing unsupervised visits in November 2025, would have been beyond the 18-month review period and even beyond the rendering of the court's decision at the contested hearing in October 2025. Mother fails to persuasively articulate why the provision of supervised visitation in this case – in accordance with the Department's recommendation, Mother's agreement, and the child's wishes – caused the provision of reunification services in this case to be less than reasonable.

Second, regarding Mother's argument that family counseling "was nothing more than an arbitrary attempt to justify the Department's decision to effectively thwart reunification," she fails to provide a persuasive factual basis to support this argument. The record reflects that *Mother* requested, at the hearing on the section 388 petition in late July 2025, that the juvenile court "amend the case plan today to include family therapy as deemed appropriate by the parents and [the child's] individual therapist." Mother explained that it had "come to light that [the child] is currently not comfortable with or willing to go to unsupervised visits with" Mother. Mother stated, "I just want the case plan to kind of address this need, if it is an appropriate tool to address this need, and

25

to hold the Department to explaining why or why not family therapy is appropriate or not." The court ultimately ordered the Department to "conven[e] the CFT to discuss the issue of readiness of both parties to engage in a family therapy, and if they are ready the Department should use all efforts to expeditiously begin family therapy." Family therapy was discussed at the subsequent CFT meeting, and the continuing assessments by the Katie A. team thereafter indicated that family therapy was not yet appropriate. In view of this record, we conclude that the juvenile court did not err in determining that the Department provided reasonable services, even in relation to family therapy.

We are not persuaded by Mother's reliance on *In re Alvin R.* (2003) 108 Cal.App.4th 962 (*Alvin R.*). In *Alvin R.*, the appellate court determined that reasonable services were not provided because the department "effectively abdicated its responsibility to effectuate timely" counseling for the child and subsequently "failed to take timely steps necessary to have father and [child] begin conjoint counseling." (*Id.* at p. 965.) The "resulting delay effectively precluded any meaningful visitation" between parent and child. (*Id.* at pp. 965-966.) The appellate court observed that the "longer parent and child live with no visitation, the less likely there will ever be any meaningful relationship." (*Id.* at p. 973.)

In contrast to *Alvin R.*, there is no evidence in this case that the Department "effectively abdicated its responsibility to effectuate timely" counseling, or otherwise "failed to take timely steps necessary" to effectuate joint counseling, with a "resulting delay" that "precluded any meaningful visitation." (*Alvin R.*, *supra*, 108 Cal.App.4th at p. 965.) To the contrary, the record reflects that Mother and the child each participated in individual counseling, that family sessions were also conducted for a period of time, and that when the child refused to participate in any further therapy, the Katie A. team regularly and continuously assessed whether therapy should resume. Even during this time period when the child was refusing therapy, the child continued to want visitation

26

and Mother continued to have regular visitation.  Further, even with supervised visitation, there remained a "strong bond" between the child and Mother.

Finally, to the extent Mother contends that the social worker made improper comments to Mother, the caregiver, and the Katie A. facilitator regarding permanency planning while the reunification period was still ongoing, the social worker testified about the general reasons for those discussions.  For example, parents are notified from the outset about possible outcomes in the case.  Caregivers are kept informed regarding the likelihood of reunification and discussions are had regarding concurrent home agreements.  The social worker also collaborated with the Katie A. team, which included behavioral health professionals, regarding how the child was progressing, reunification, and concerns, which necessarily required the social worker to keep the Katie A. team updated on the Department's thoughts about the case.  Although the social worker reasonably had concerns about Mother's ability to maintain sobriety, the social worker also testified that she "continue[d] to assess the family during the entire reporting period."  Further, notwithstanding any statements by the social worker that may have indicated the social worker's concerns about Mother's inability to remain sober, the social worker, as the juvenile court found, appeared to have "worked tirelessly with the parents, and in particular with the mother, to ensure that she had the services that she needed."  In other words, the Department made an " 'effort . . . to provide reasonable reunification services in spite of difficulties in doing so or the prospects of success.' " (*In re K.C.* (2012) 212 Cal.App.4th 323, 329.)

We acknowledge Mother's efforts to address her long-standing alcohol dependency, and we recognize that Mother loves her child.  However, based on the record in this case, we conclude that substantial evidence supports the trial court's finding that reasonable reunification services were provided to Mother.

27

### III. DISPOSITION

The petition for extraordinary writ and the request for stay are denied. This opinion is made final as to this court seven days from the date of filing. (Cal. Rules of Court, rules 8.452(i), 8.490(b)(2)(A).)

_____
                              Greenwood, P. J.


WE CONCUR:


_____
 Danner, J.


_____
 Bromberg, J.


H053827 D.B. v. Superior Court